**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 14, 2013

No. 11-50961

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

JERRY EDWARD WEAVER,

Defendant-Appellant

Appeals from the United States District Court
for the Western District of Texas
USDC No. 5:10-CR-967-5

Before HIGGINBOTHAM, OWEN, and GRAVES, Circuit Judges.

PER CURIAM:[*]

This is an appeal from a conviction for "title washing," a process by which a vehicle's title is fraudulenty altered to indicate a clean title. The defendant, Jerry Edward Weaver, argues that insufficient evidence supported the jury's verdict. He also argues that the prosecutor's closing argument, which included a remark that fairness to the defendant should be the "last thing on [the jurors'] minds", constituted plain error and a violation of his constitutional right to due process. For the reasons below, we affirm.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-50961

## FACTS AND PROCEDURAL HISTORY

Jerry Edward Weaver was charged in a multi-count superseding indictment with two counts of aiding and abetting codefendant Babauk Omeed Harizavi in committing mail fraud, in violation of 18 U.S.C. §§ 2 and 1341. The scheme involved the practice of "title washing," a process by which a vehicle's title is fraudulently altered to indicate a clean title. Title washing conceals information that should normally be contained on the title, such as notations or "brands" that the vehicle had been deemed non-repairable and suitable for parts only or deemed a salvage motor vehicle. Such brands are typically meant to put all on notice that the vehicle has been extensively damaged and may not be safe to drive.[1]

Weaver, the owner and operator of JW Auto Group in Rowlett, Texas, purchased out-of-state automobiles from the General Services Administration (GSA) that he knew to be "parts-only" or "salvage," repaired them, and then paid Harizavi to obtain clean titles by filing fraudulent mechanic's lien paperwork and other fraudulent documents with the Bexar County Tax Assessor-Collector's Office in San Antonio. Those documents functioned to remove the "salvage" or "parts-only" designations from the original titles. The Texas Department of Motor Vehicles issued the clean titles and delivered them through the U.S. mail. Weaver then sold the vehicles to unsuspecting customers, who would not have bought the vehicles had they been aware of the prior damage and designations.

At the jury trial, Weaver claimed he did not knowingly participate in aiding and abetting mail fraud. Specifically, he asserted he did not know Harizavi was using illegal means—via the Texas mechanic's lien statute—to wash the titles. He claimed he was merely a spectator to Harizavi's title washing scheme, and lacked the specific intent to defraud his customers.

---

[1] There is no legal means by which vehicles with salvage or parts-only titles may receive clean titles in Texas without reference to their prior title history.

2

No. 11-50961

Moreover, he argued, he "was satisfied things were in order, and did not feel the need to learn the procedure Mr. Harizavi had used . . . . , and his conscience was clear because he had sold the cars with a clean title and he had repaired them so 'the cars were safe.'"

The jury found Weaver guilty on two counts of aiding and abetting mail fraud based on his sale of two title-washed cars to unsuspecting customers. The district court sentenced him to 24 months on each count, to be served concurrently, followed by a three-year period of supervised release. Weaver's trial counsel withdrew after the verdict and Weaver timely appealed *pro se* and moved for release pending appeal. The district court denied the motion. Weaver, through new counsel, then moved this court for release pending appeal. This court denied the motion because Weaver had not shown that his appeal would raise a substantial question of law or fact.

## DISCUSSION

Weaver asserts two issues on appeal. First, he contends the evidence was insufficient to establish his guilty knowledge of the fraudulent scheme. Second, he argues that the prosecution's closing argument was inflammatory, casting significant doubt on the jury's verdict. He claims the closing argument met the plain error standard and also violated his constitutional right to due process of law. We address each argument in turn.

## I.    Sufficiency of the Evidence

At the close of the government's case and again at the close of the defense's case, Weaver moved for a judgment of acquittal, asserting that the evidence was insufficient to prove his intent to participate in the scheme to defraud. Therefore, we review the claim *de novo*. *United States v. McCauley*, 253 F.3d 815, 818 (5th Cir. 2001) (holding that a denial of a motion for judgment of acquittal is reviewed *de novo*).

No. 11-50961

In assessing a challenge to the sufficiency of the evidence to sustain a conviction, we consider "whether, viewing the evidence in the light most favorable to the government, a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Id.* (quotation omitted). "All reasonable inferences from the evidence must be construed in favor of the jury verdict." *United States v. Martinez*, 975 F.2d 159, 161 (5th Cir. 1992). Our review of sufficiency is "highly deferential to the verdict," and recognizes that it is solely the jury's role to assess credibility and weigh the evidence. *United States v. Seale*, 600 F.3d 473, 496 (5th Cir. 2010) (quotation omitted). "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence." *Id.* (quotation omitted).

To obtain a conviction for mail fraud under 18 U.S.C. § 1341, the government must prove "(1) a scheme to defraud; (2) the use of the mails to execute the scheme; and (3) the specific intent to defraud." *United States v. Bieganowski*, 313 F.3d 264, 275 (5th Cir. 2002) (quotation omitted). To show intent to defraud, the government "must prove that the defendant contemplated or intended some harm to the property rights of the victim." *United States v. Leonard*, 61 F.3d 1181, 1187 (5th Cir. 1995). A jury may infer intent to defraud from all the facts and circumstances surrounding the transaction in question. *United States v. Aubrey*, 878 F.2d 825, 827 (5th Cir. 1989). With respect to aiding and abetting, the government must prove that the elements of the substantive offense occurred and that the defendant associated himself with it, participated in it, wished to bring it about, and sought by his action to make it succeed. *United States v. McDowell*, 498 F.3d 308, 313 (5th Cir. 2007) (quotations omitted).

No. 11-50961

As he did before the district court, Weaver contends the evidence was insufficient to prove his knowledge or intent beyond a reasonable doubt. He asserts that, to the contrary, the record establishes that he repaired vehicles he believed to be salvageable, then sold them after Harizavi brought him what he believed to be legitimately clean titles. Weaver argues that he was ignorant of the process by which titles were procured and that Harizavi was the sole perpetrator of the scheme to defraud.

Weaver ignores the overwhelming weight of the evidence establishing his guilty knowledge, including his own written confession. At trial, FBI Agent Heath Janke testified that Harizavi became the subject of a sting operation regarding title washing activities in Texas, after which he agreed to be a confidential informant (CI), cooperating with the investigation and assisting in the collection of evidence against customers paying him to obtain fraudulent titles. As a result, agents learned that Weaver and JW Auto Group had paid for six washed titles on GSA cars in June 2010. In August, after Harizavi became a CI, Weaver contacted him to place more orders for clean titles on parts-only or salvage cars, and Harizavi recorded phone conversations regarding the transactions, which recordings were played for the jury.

Following these conversations, Agent Janke orchestrated a controlled delivery of three clean titles that Weaver had paid Harizavi to procure through the use of fraudulent paperwork. After accepting the paperwork from a deliveryman, Weaver was confronted by agents and admitted to having used Harizavi to obtain good clean titles for salvage or parts-only vehicles. Specifically, Agent Janke testified that: (1) Weaver admitted he purchased GSA vehicles because the government did not report damage or title status to Carfax, Inc., meaning that customers could not independently investigate the vehicle history; (2) Weaver knowingly purchased cars with salvage or parts-only titles for which he knew he could not legitimately obtain clean titles; (3) after selling

5

No. 11-50961

Harizavi some parts on such a vehicle and learning that Harizavi could fraudulently obtain clean titles, Weaver paid Harizavi to wash titles for him; and (4) Weaver then sold the cars without disclosing their true nature or prior designation to his customers. Weaver told the agents that he did not believe he had wronged his customers because the cars he sold were in fact adequately repaired. He advised the agents that he engaged in the fraudulent scheme because he was having serious financial difficulties. Weaver also voluntarily provided the agents with a written confession of his knowledge and guilt, which statement was read to the jury and admitted into evidence.

Harizavi also testified, explaining the fraudulent process by which he obtained clean titles for his customers and stating that he had explained the process to Weaver, after which Weaver hired him to obtain fraudulent clean titles for GSA parts-only or salvage vehicles. According to Harizavi, at one point he specifically instructed Weaver on how to obtain the clean titles without his assistance, but Weaver preferred to pay him to do it.

Weaver testified in his own defense, asserting that although he had been in the car business for over 10 years, he did not understand mechanic's liens or the process by which titles were obtained; that Harizavi never told him that the titles he paid for were illegitimate; and that he believed the titles were in fact legal. He specifically denied any knowledge of Harizavi's scheme and testified he had been deceived by Harizavi. Nevertheless, Weaver conceded on cross-examination that he had admitted his guilt to the FBI agents who questioned him. Weaver explained that he eventually became suspicious of Harizavi and admitted his mistake when he realized that Harizavi had taken advantage of him.

Viewing the record in the light most favorable to the verdict, the evidence was sufficient to prove Weaver's guilty knowledge and knowing participation in the scheme to defraud. *See McDowell*, 498 F.3d at 313; *Leonard*, 61 F.3d at

6

1187; *Aubrey*, 878 F.2d at 827.  Weaver's insufficiency argument amounts to no more than an assertion that the jury should have credited his testimony denying any knowledge of the scheme, rather than accepting Agent Janke's testimony, Harizavi's testimony, or his own written confession.  The jury, however, was entitled to discredit Weaver's testimony and credit the government's version of events, and this court should not revisit that credibility determination.  *See Seale*, 600 F.3d at 496.  Accordingly, we find the evidence sufficient to support a conviction of aiding and abetting mail fraud.

## II.     Remarks in Prosecutor's Closing Argument

Weaver asserts that the prosecutor made improper and prejudicial remarks during closing argument.  First, he argues that the prosecutor improperly told the jurors that fairness to Weaver should be "the last thing" on their minds.  The government counters that, because the defense's theme was "[i]t is not fair to Jerry Weaver," the prosecutor argued in rebuttal to the jury that "[f]airness to Jerry Weaver should be the last thing on [a juror's] mind" when compared to the material false representations Weaver made to the victims of his fraud.  Second, Weaver points to the prosecution's closing rebuttal, wherein the prosecutor argued that "according to [Weaver], everyone is a liar, but him."  The government explains the prosecutor intended the sarcastic comment to mean that Weaver was arguing the government's witnesses—Weaver's customers, the GSA vehicle evaluators, and the FBI—were "all liars."  Third, Weaver claims prejudice resulting from the prosecutor's remark on Weaver's "arrogance" in discounting GSA evaluators' opinions on the salvageability of the vehicles.  Weaver contends that these closing remarks satisfied the plain error standard and denied him due process of law.

### a.     *Plain Error Analysis*

It is undisputed that Weaver failed to object to the prosecutor's comments at closing.  Consequently, review is for plain error.  *United States v. Gracia*, 522

F.3d 597, 600 n.2 (5th Cir. 2008) (holding that when a defendant does not object to allegedly improper prosecutorial comments at trial, this court reviews only for plain error).  To demonstrate reversible plain error: "(1) there must be an error or defect—some sort of [d]eviation from a legal rule—that has not been intentionally relinquished or abandoned; (2) the legal error must be clear or obvious, rather than subject to reasonable dispute; (3) the error must have affected the appellant's substantial rights; and (4) if the above three prongs are satisfied, the court of appeals has the discretion to remedy the error—discretion which ought to be exercised only if the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."  *United States v. Escalante-Reyes*, 689 F.3d 415, 419 (5th Cir. 2012) (*en banc*) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)) (internal quotation marks omitted and alterations in *Puckett*).

With respect to alleged improper prosecutorial remarks, the third prong of plain error review "sets a high bar," with the determinative question being "whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict."  *Gracia*, 522 F.3d at 603 (quotation omitted).  The effect of a prosecutor's remarks is evaluated in the context of the trial as a whole.  *United States v. Mendoza*, 522 F.3d 482, 496 (5th Cir. 2008).  Specifically, this court considers: (1) the magnitude of the prejudicial effect of the prosecutor's remarks; (2) the efficacy of any cautionary instruction by the judge; and (3) the strength of the evidence supporting the conviction.  *Id.* at 492 (citations omitted).

The prosecutor's "fairness" comment was improper.  Weaver's argument, however, fails on the third prong of plain error review—any error did not affect Weaver's substantial rights because of the overwhelming evidence supporting his conviction, as discussed in detail above.  *See United States v. Vaccaro*, 115 F.3d 1211, 1215 (5th Cir. 1997); *see also Puckett*, 556 U.S. at 135.  Indeed, the strength of the evidence severely limited the magnitude of any prejudicial effect

that the comment may have had. Consequently, Weaver's plain error argument fails.

### b. *Due Process Analysis*

Weaver asserts that the prosecutor's closing argument violated his constitutional right to due process of law, which he contends in his reply brief is distinct from his plain error argument. Weaver Reply Br. at 2 (stating that this court should also "review for a violation of the Due Process Clause without the need for showing all the elements of plain error."). Nevertheless, he does not clearly cite a standard for an independent constitutional due process violation and instead seems to conflate meeting the plain error standard with a denial of one's constitutional right to due process of law. *See* Weaver Opening Br. at 8 ("Mr. Weaver respectfully submits that the prosecutor's argument for no fairness to the accused . . . infected the fairness, integrity and public reputation of the trial. Mr. Weaver further submits this denial of fairness constitutes plain error in violation of his rights under the United States Constitution as defined by the United States Supreme Court and this Circuit.").

Indeed, the standard he appears to cite for such a due process violation is the fourth prong of the plain error analysis—whether the error seriously affected the fairness, integrity or public reputation of judicial proceedings. *See id.*; *id.* at 14 (quoting *Gracia*, 522 F.3d at 600) ("[T]he comments made by the prosecutor also infected the 'fairness, integrity and public reputation of his trial.'").[2] Therefore, we treat Weaver's due process argument as an argument that the fourth prong of plain error review was satisfied. *See* Weaver Opening Br. at 11 ("[T]he right to a fair trial is part of the fundamental guarantee of due process provided by the United States Constitution. *Because the defense did not object,*

---

[2] Of note, *Gracia* applied the fourth prong of plain error review, and did not address whether the prosecutor's closing remarks violated the defendant's constitutional right to due process. *Gracia*, 522 F.3d at 605.

No. 11-50961

*the review of this point of error is for plain error.* Respectfully, the prosecutor violated this right when she told the jury that fairness should be the last thing on their minds when it came to Mr. Weaver.") (emphasis added).[3]

We have held that "[m]eeting all four prongs of plain-error review is difficult, as it should be." *United States v. John*, 597 F.3d 263, 285 (5th Cir. 2010) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9 (2004)) (internal quotation marks omitted). The fourth prong of plain error review is discretionary, *id.*, and is "meant to be applied on a case-specific and

---

[3] At another point in his opening brief, Weaver seems to assert that whether a prosecutor's remarks were "inflammatory" is the standard for determining a due process violation:

> This Court has designated this "due process standard" as "the *Donnelly* ruler." *United States v. Mendoza*, 522 [F.3d] 482, 496 (5th Cir. 2008). Under this standard, the *Donnelly* ruler is a measuring stick by which the Government can add up the inches of error and still prevail by showing there was no due process violation. However, in *Mendoza*, the inches did not add up to a violation because the prosecutor's comments were "not inflammatory." *Id.*
>
> Respectfully, the statements in this case are not only inflammatory by implication, they are explicitly inflammatory.

Weaver Opening Br. at 13 (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

The *Mendoza* panel, however, applied our three-factor test articulated above for reversible error due to prosecutorial misconduct: (1) the magnitude of the prejudicial effect of the prosecutor's remarks; (2) the efficacy of any cautionary instruction by the judge; and (3) the strength of the evidence supporting the conviction. *Mendoza*, 522 F.3d at 492. The goal of this analysis is to determine "whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." *Id.* Though noting that "[t]he difference between the due process standard and one that considers the seriousness of doubt about the correctness of the jury's verdict[] may be disputed," the *Mendoza* panel also applied the "*Donnelly* ruler" for constitutional error:

> One point at which caselaw concerning constitutional error intersects with the caselaw about review of improper closing arguments is when the prosecutor's remarks have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Under the *Donnelly* test of pervading unfairness, an improper comment may become constitutional error, but it is only the exceptional case in which that will occur.

*Mendoza*, 522 F.3d at 493 (5th Cir. 2008) (citing *Donnelly*, 416 U.S. at 643). Applying both tests, the *Mendoza* panel found no reversible or constitutional error based on the prosecutor's closing comments about the defendant's courtroom demeanor. *Id.* at 496-97.

In any case, *Mendoza* may be distinguished because the defendant preserved the alleged error for appellate review. Here, Weaver did not object to the prosecutor's closing argument and thus failed to preserve the argument for our review.

10

No. 11-50961

fact-intensive basis," *id.* at 286 (quoting *Puckett*, 556 U.S. at 142) (internal quotation marks omitted). Nevertheless, "[t]he discretion inherent in the plain-error standard is not tantamount to caprice." *Id.* at 288.

Here, because Weaver failed to satisfy the third prong of plain error review, we logically conclude that the prosecutor's closing argument did not seriously affect the fairness, integrity or public reputation of judicial proceedings. Therefore, to the extent Weaver argues a due process violation separate from his plain error argument, the argument fails.

## CONCLUSION

Sufficient evidence supported Jerry Edward Weaver's convictions of aiding and abetting mail fraud. Furthermore, Weaver has not established all of the elements for plain error relief stemming from his claim of prosecutorial misconduct, nor has he sufficiently argued any freestanding due process violation. We therefore AFFIRM.